UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHAEL HAMMILL,

    Plaintiff,

v.                                                         Case No. 19-C-1785

ANDREW M. SAUL,
Commissioner of Social Security,

    Defendant.

## DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION

Plaintiff Michael Hammill filed this action for judicial review of a decision by the Commissioner of Social Security denying his application for disability insurance benefits under Title II of the Social Security Act. Hammill asserts that the administrative law judge (ALJ) erred by failing to adequately consider the effects of Hammill's hypoglycemia on his ability to work and in assessing his residual functional capacity (RFC). For the reasons that follow, the Commissioner's decision will be affirmed.

## BACKGROUND

Hammill filed an application for disability insurance benefits on August 30, 2016, alleging disability beginning March 18, 2016. R. 23. He listed blockage of the coronary artery/application of stent, hypoglycemic condition, diabetes, and removal of disc between the sixth and seventh vertebrae as the conditions limiting his ability to work. R. 171. After his application was denied initially and upon reconsideration, Hammill requested a hearing before an ALJ. R. 23. On November 28, 2018, ALJ Michael Balter conducted a video hearing at which Hammill, represented by counsel, and a vocational expert (VE) testified. R. 36–67.

At the time of the hearing, Hammill was 64 years old and living in a home with his wife. R. 44, 55. He has two associate degrees—one in engine technology and one in mechanics. R. 44. From 2003 to 2016, Hammill worked as a pressured milling supervisor, supervising a large crew and monitoring the maintenance of production machinery. R. 46. He left that position after a period of short-term disability due to his difficulty dealing with his diabetes-related low blood sugar issues. R. 47–48. Hammill subsequently worked about 20 hours a week caring for elderly individuals in their homes. R. 44–45. He quit that job because he had a low blood sugar episode during which he lost consciousness and he did not want to risk something happening while others were under his care. R. 46.

Hammill testified that his major problem is his inability to sense when his blood sugar is too low. R. 48. He stated that he has had diabetes since 1985, and that he used to be able to sense when his blood sugar was dropping because he would perspire and shake, but that this ability seemed to go away in about 2015 or 2016. R. 48–49. He testified that, despite having an insulin pump that monitors his blood sugar, the low blood sugar events happen without warning. R. 50. During these events, he loses consciousness, and after he wakes and eats something, it takes about half an hour to an hour to recover. R. 50–51. In terms of frequency, however, Hammill testified at the November 28, 2018, hearing to only two "bouts" for the entire year. R. 49. He also testified that he drives his car but always checks his blood sugar before he drives. R. 52.

Hammill also testified that he has fully recovered from having a disc removed from between his sixth and seventh vertebrae, and that he has sleep apnea and uses a CPAP machine. R. 52–53. He mentioned that he has arthritis in his feet, but he does not have problems with walking or balance, and that his only problem with sitting is restlessness. R. 53–54. He testified that his wife had recently had a knee replacement, so his typical day involved cooking for her and

2

feeding her, as well as cleaning the house, doing other household chores, and grocery shopping if needed. R. 55–56. He also discussed his activities, stating that he likes to be physically active and used to hike a lot with his wife before her surgery. R. 56.

In an eight-page decision dated December 6, 2018, the ALJ determined that Hammill was not disabled from March 18, 2016, through the date of the decision. R. 23. In reaching that decision, the ALJ followed the five-step sequential evaluation process for determining disability prescribed by the Social Security Administration (SSA). R. 24. The ALJ first determined that Hammill met the insured status requirements of the Social Security Act through June 30, 2020. R. 25. At step one, the ALJ found that, although Hammill had worked since the alleged onset date of March 18, 2016, he had not engaged in substantial gainful activity since that date. *Id*. At step two, the ALJ concluded that Hammill's diabetes mellitus with hypoglycemia unawareness was a severe impairment that significantly limited his ability to work. *Id*. At step three, the ALJ determined that Hammill did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix A. R. 26.

The ALJ then assessed Hammill's RFC, finding that he could "perform a full range of work at all exertional levels" but with non-exertional limitations related to his impairment. Specifically, Hammill could not climb "ladders, ropes, and scaffolds," but could "occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl." *Id.* He could not drive commercially and "must avoid all exposure to hazards such as unprotected heights and dangerous moving machinery." *Id.* At step four, the ALJ determined that Hammill was unable to perform any past relevant work as a milling supervisor. R. 28. At step five, the ALJ found that based on the testimony of the VE, and considering Hammill's age, education, work experience, and RFC, Hammill could perform

3

representative jobs, such as packer, cook helper, and assembler, that existed in significant numbers in the national economy. R. 29–30. The ALJ then found that Hammill was not disabled under the Social Security Act. R. 30. The Appeals Council declined to review the ALJ's decision, making that decision the final decision of the Commissioner of Social Security. R. 1.

## LEGAL STANDARD

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the SSA at the fifth step in the sequential process, the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense, given the fact that the vast majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because, for many physical and mental impairments, objective evidence cannot distinguish those that render a person incapable of full-time work from those that make such employment merely more difficult. Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of Social Security. Judicial review of the decisions of the Commissioner, like judicial review of all administrative agencies, is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the

4

burden of proof; a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

Nor does the test require that the Commissioner cite conclusive evidence that the claimant is able to work. Such evidence, in most cases that go to hearing, is not available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court recently reaffirmed that "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and his conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556

5

F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

**ANALYSIS**

Hammill challenges the ALJ's RFC assessment. In particular, he asserts that the ALJ did not properly assess the evidence regarding his hypoglycemia. He maintains that the ALJ's failure to consider this condition and accommodate it in the RFC resulted in an RFC that is not supported by substantial evidence. An RFC is an assessment describing the extent to which an individual's impairments may cause physical or mental limitations or restrictions that could affect his ability to work. SSR 96-8p, 1996 WL 374184, at *2. The RFC represents "the maximum a person can do—despite his limitations—on a 'regular and continuing basis,' which means roughly eight hours a day for five days a week." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting SSR 96-8p). In forming the RFC, an ALJ must review all of the relevant evidence in the record and

6

"consider all limitations that arise from medically determinable impairments." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014).

A fair reading of the ALJ's decision reveals that he fully considered Hammill's testimony and the evidence in the record regarding Hammill's hypoglycemia. Hammill's complaint is not that the ALJ did not consider his hypoglycemia but that the ALJ did not find that Hammill's infrequent episodes of hypoglycemia unawareness rendered him disabled. The ALJ summarized Hammill's testimony regarding his hypoglycemia. He noted that Hammill testified that he continues to have episodes of hypoglycemia unawareness, but with only two occurring in an eleven-month period. R. 27. Hammill described these episodes as sudden onset of unconsciousness in which he will come to approximately 30 to 45 minutes later and only then realize he is having a hypoglycemic episode, at which point he will remedy it. Hammill estimated that it takes about an hour to fully recover from the episodes. R. 28. While the ALJ concluded that Hammill's hypoglycemia unawareness "is certainly significant and limiting in terms of his ability to be exposed to hazards, including driving, it does not impose such limitations that would preclude all types of work." *Id.*

In reaching this conclusion, the ALJ looked to Hammill's testimony and activities of daily living. The ALJ noted that Hammill denied having any significant physical limitations and that he continues to drive but ensures that he checks his blood sugar prior to getting in the car, suggesting that he is able to monitor his condition and take precautions to avoid hypoglycemic episodes. He takes care of his wife, who just had knee replacement surgery, and manages the household chores, cooking, grocery shopping, and yardwork. Hammill indicated several times throughout the hearing that he prefers to stay active and busy and does not like to be sitting around idle. He testified that he enjoys watching auto racing, hiking, and bicycling. *Id.*

As to the medical evidence, the ALJ noted that Hammill presented to his primary care doctor, Stephen Leonard, M.D., on February 11, 2016, with complaints of several episodes of low blood sugar occurring at work and causing him issues with his employment. R. 26–27. The ALJ stated that Hammill decided to go on short-term disability from work, with the support of Dr. Leonard, to try to get his diabetes under better control, effective March 12, 2016. In a letter dated March 9, 2016, Dr. Leonard indicated that he did not think Hammill should continue working, given his hypoglycemic episodes. R. 27 (citing R. 281–83, 317).

The ALJ noted that, on April 11, 2016, Hammill saw endocrinologist Ferdinand Casis, M.D., and they discussed restarting an insulin pump and that Hammill started the insulin pump at some point in 2016. *Id.* In a follow-up with Dr. Leonard on May 26, 2016, Hammill reported a decrease in hypoglycemic episodes since being off work, and he formally separated from his employment permanently as of September 9, 2016. *Id.* (citing R. 285, 315). The ALJ noted that in a follow-up with Dr. Casis on December 6, 2017, Hammill reported "occasional" unawareness of his blood sugar being low. *Id.* (citing R. 319–20). In a November 12, 2018 letter, Dr. Casis indicated that Hammill was utilizing both a continuous insulin pump and a continuous glucose monitoring system with good compliance; however, he continued to have some hypoglycemic episodes, albeit less frequently. *Id.* Dr. Casis noted in the letter that these episodes placed Hammill at great risk for injury. *Id.* (citing R. 363). The ALJ noted that in a November 19, 2018 letter, Laura Van Guilder, RD CDE CPT, Hammill's diabetes educator and insulin pump trainer, indicated that Hammill had shown consistent dedication and commitment to trying to improve his blood sugar control, but he continued to experience hypoglycemia unawareness. *Id.* She described hypoglycemia unawareness as "when someone is unaware of a deep dangerous drop in blood sugar because it fails to trigger the secretion of epinephrine, which generates the symptoms of

hypoglycemia such as dizziness, sweating, anxiety, heart palpitations, and confusion that serve to warn . . . that his blood sugar is dropping." *Id.* (quoting R. 365).

The ALJ also considered the opinions of the state agency reviewing physicians, who found that Hammill did not even have a severe medically determinable impairment. *Id.* (citing R. 69–76, 78–87). The ALJ afforded the state agency assessments some weight. He explained that Hammill's medically determinable impairments other than diabetes are non-severe in nature, but considering the record at the hearing level, including Hammill's hearing testimony, the ALJ found that Hammill's hypoglycemic unawareness is certainly considered an impairment that causes more than minimal limitation in his ability to work. R. 28.

Hammill asserts that the ALJ's assessment of the records from Dr. Leonard and Dr. Casis is "questionable." Pl.'s Br. at 10, Dkt. No. 17. Hammill maintains that Dr. Casis stated he was at "great risk for injury" and that the ALJ failed "to discuss this evidence" along with the other evidence showing Hammill blacked out and took up to 60 minutes to recover. *Id.* But, as discussed above, the ALJ explicitly considered this opinion from Dr. Casis as well as Plaintiff's testimony describing his blackouts. R. 27–28.

As to Dr. Leonard, Hammill asserts that the ALJ erred in assuming that when Dr. Leonard opined that Hammill "should not work any further from this point on," he was referring to Hammill's supervisory shift work at the mill. Pl.'s Br. at 10. Hammill contends that it is "just as reasonable" to assume that Dr. Leonard was referring to "any future work." *Id.* The Court's role is not to reweigh the evidence but merely to determine whether the ALJ's interpretation was reasonable. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Hammill has not shown that the ALJ's analysis was an unreasonable interpretation of Dr. Leonard's opinion, in light of the fact that Dr. Leonard wrote the opinion as support for Hammill's *short-term disability* request from his

9

position at the mill.  R. 27, 317.  Hammill also challenges the ALJ's explanation that Dr. Leonard's opinion did not warrant more weight because it was on an issue reserved to the Commissioner. But the ALJ is correct.  *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("[A] claimant is not entitled to disability benefits simply because [his] physician states that [he] is 'disabled' or unable to work.  The Commissioner, not a doctor selected by a patient to treat [him], decides whether a claimant is disabled.").  Therefore, Hammill's argument that the ALJ's evaluation of the medical records was "questionable" is without merit.

Hammill also asserts that the ALJ "did not meet his statutory duty to consider and analyze third-party statements and explain why he is disregarding obvious evidence that confirms Hammill is unable to work."  Pl.'s Br. at 10.  But the ALJ did consider the third-party statements.  Sherryl Weber provided a statement explaining that Hammill assisted with caring for her father for approximately 20 hours a year from the spring of 2016 to May 2017.  R. 253.  She indicated that Hammill would have "an occasional time when he would have a hard time concentrating, like brain fog."  *Id.*  She explained that during conversations, he would appear "a little confused and sometimes he could not recall the past few minutes."  She also described an incident in the fall of 2016 where Hammill "zoned out and wasn't making much sense," but got better after eating, and another incident in January 2017 where he had apparently blacked out after leaving her father's house and didn't arrive at his own home for hours.  *Id.*  She asserted that his episodes "happened quickly without warning" and that he would need to rest after the episodes.  *Id.*  Darcie Powell, Hammill's former co-worker, also submitted a short statement explaining how Hammill's diabetic symptoms had worsened over time, and he "would have trouble, he would forget what he was doing, he would just stop and stare at you."  R. 255.  She noted that during his last year of work it was "really bad" and "[h]e had trouble remembering what he was doing."  *Id.*  She would have

10

him sit down and eat something, until he would remember where he was. *Id.* The ALJ summarized the third-party statements, R. 27, and stated that the "statements of Ms. Clifford and Ms. Powell were considered and afforded some weight. They provided some additional insight into the nature of the claimant's condition, thereby assisting in the formulation of an appropriate residual functional capacity assessment." R. 28. While both statements reinforced the nature of Hammill's hypoglycemia symptoms, neither "confirm Hammill is unable to work." *See* Pl.'s Br. at 10. Even if they had made such assertions, the decision as to whether a claimant is disabled is reserved for the ALJ. 20 C.F.R. § 404.1527(d)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability."). In short, the ALJ appropriately considered and evaluated the third-party statements.

> After summarizing the record, ALJ ultimately concluded:
>
> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are not consistent with total disability. While the hypoglycemia unawareness is certainly significant and limiting in terms of his ability to be exposed to hazards, including driving, it does not impose such limitations that would preclude all types of work. The claimant testified at the hearing that he is fully functional and does not have any significant physical, exertional limitations. As such, it is reasonable to conclude that he could perform work within the confines of the given residual functional capacity.

R. 28. The ALJ found that Hammill has the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: "He is unable to climb ladders, ropes, and scaffolds. He can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He is unable to engage in any commercial driving. He must avoid all exposure to hazards such as unprotected heights and dangerous moving machinery." R. 26. Although Hammill may have preferred that the ALJ reach a different conclusion, a reviewing court may not substitute its judgment for that of the agency it is tasked to review. The ALJ's discussion of Hammill's hypoglycemia was thorough. The ALJ recognized that Hammill has impairments that impact his

ability to work but not to the degree alleged. Substantial evidence supports his RFC finding. Therefore, his decision must stand.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**. The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** at Green Bay, Wisconsin this 24th day of March, 2021.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge